**In re the Marriage of: William A. DABILL, petitioner, Respondent,**

v.

**Brenda K. DABILL, Appellant.**

No. C9–93–1728.

Court of Appeals of Minnesota.

April 5, 1994.

Susan C. Rhode, Moss & Barnett, P.A., Minneapolis, and E. Jane Sundby, Fargo, ND, for appellant.

Wilbert E. Hendricks, Pine River, for respondent.

Roger B. Marth, Laporte, guardian ad litem.

Considered and decided by FORSBERG, P.J., and CRIPPEN, and AMUNDSON, JJ.

## OPINION

CRIPPEN, Judge.

Brenda Dabill appeals an order of the district court modifying a custody order, placing physical custody of two minor children with respondent William Dabill and retroactively reducing respondent's child support obligation. We reverse.

## FACTS

Appellant Brenda Dabill and respondent William Dabill were divorced in August 1990. The parties stipulated to the custody of their five-year-old son, M.A., and their two-year-old daughter, M.J. Although legal custody rights were to be joint, primary physical custody was placed with appellant and visitation was provided for respondent.

At the time of the divorce, appellant lived in Glyndon, Minnesota and respondent lived in Pine River, Minnesota, approximately two hours away. Initially, respondent's visitation occurred in Glyndon, but later M.A. and M.J. visited their father at the home in Pine River that he shared with his girlfriend (later his wife) and her two children, a girl now 12 years old, and a boy now age 5.

After returning from a visit in November of 1990, M.J. told appellant that the daughter of respondent's girlfriend had inappropriately touched her. Appellant related this to respondent, and requested that he make an extra effort to supervise the children. Respondent refused to acknowledge the possibility that the incident may have occurred.

In January 1991, the Cass County Department of Social Services conducted an investigation but was unable to conclude that any sexual abuse had occurred. However, appellant did seek counseling for M.J. at the Rape and Abuse Crisis Center in Fargo, North Dakota. Connie Magnuson, a licensed psychologist at the center, met with M.J. and counseled her with regard to touching, personal boundaries, assertiveness, and self-esteem. Magnuson stated that she does not investigate incidents of alleged abuse, but rather tries to provide education and therapy appropriate for the child's age as a method of prevention. This counseling lasted until April 1991.

In February 1991, M.J. was examined by Dr. Caroline Levitt. While Dr. Levitt could find no physical evidence that M.J. had been abused, she noted that M.J. made very clear statements that an 11-year-old girl had sexually touched her. Dr. Levitt felt M.J. was very verbal for her age, and that her statements convincingly indicated that M.J. was relating a first-hand experience.

Respondent brought his first motion for change of custody, for an evidentiary hearing on the matter, and for appointment of a guardian ad litem in April 1991. In its May 1991 order, the court appointed Roger Marth, a self-employed businessman from Pine River, as the guardian ad litem, but did not address the custody issue.

M.A. began attending the Rape and Abuse Crisis Center in August 1991. Appellant sent M.A. to meet with Ms. Magnuson because he had attempted to get M.J. and a younger cousin to touch him inappropriately. M.A.'s initial sessions with Magnuson mostly dealt with his anger about his parents' divorce. Over the course of several sessions, he disclosed to Magnuson that he enjoyed visiting his father, but did not like to see his father's stepchildren because his father's stepson had inappropriately touched him.

In December 1991, Marth, the guardian ad litem, advised the court that he felt professional assistance would help the parties deal with the emotional issues and stress caused by the touching incidents and the divorce in general, and recommended a counselor from Lutheran Social Services in Bemidji. While Marth did propose some changes to the visitation details, he also recommended that legal and physical custody remain as originally decreed because that was in the best interests of the children.

M.J. resumed her counseling sessions with Magnuson at the Rape and Abuse Crisis Center in January 1992. Appellant was concerned because M.J., now slightly less than four years old, was masturbating excessively, to the point where she was giving herself sores.

In February 1992, respondent again moved for an evidentiary hearing and a change of custody. Marth, the guardian, recommended joint physical and legal custody because he felt there were too many problems with visitation. The court scheduled a hearing to address visitation, but denied respondent's request for a custody hearing.

There were significant problems with visitation. In the initial period after the divorce, visitation was sporadic and occurred at appellant's home in Glyndon, later at respondent's home in Pine River. After M.J.'s disclosure to appellant in November 1990, appellant requested that respondent exercise his visitation in Glyndon, or alternatively that he exercise it when his stepchildren would be away from home. Respondent refused.

Appellant wanted respondent to follow a regular schedule for visitation, but respondent sometimes failed to exercise visitation due to hunting trips, illness, or work obligations. And, respondent sometimes attempted to reschedule visitation on less than the 48 hours notice required by the custody order. This posed some difficulty because appellant had moved into a trailer on her parents' farm. As she was working only part-time, she could not afford a telephone. Respondent complained that frequently he was unable to contact appellant even though he had been told he could call appellant on her parents' phone or at work.

In addition to scheduling problems, confrontations sometimes occurred. In January 1992, the guardian ad litem accompanied respondent's spouse to pick up M.A. and M.J. because respondent was unable to pick them up himself. However, when they arrived the

children refused to accompany them, and appellant did not force them to go. The children also refused to accompany respondent's spouse when she attempted to pick them up in May 1992. Also in May 1992, there was a confrontation between respondent and appellant's father when he attempted to pick up the children at the grandparents' house; there was no evidence the children witnessed this. After the court ordered respondent to remain in his car at the end of the driveway when picking up the children, respondent complained that he often had to wait 15 minutes or more before the children came outside. He felt this was unreasonable, but appellant testified that it was sometimes difficult for her to get two small children ready for a long car drive, especially in the winter.

Respondent brought his third motion for change of custody in March 1992. Marth again recommended joint physical and legal custody. The trial court file contains no record of the court's action. It appears that this motion was continued to June 1992, when the parties mutually agreed that M.A. and M.J. would spend the summer of 1992 with respondent and have regular visitation with appellant.

In July 1992, respondent's wife, Terri Dabill, contacted Cathy Liane at the Counseling Center in Brainerd. Liane met once with respondent and Terri, and then once with Terri and the four children (M.J., M.A., and Terri's daughter and son). This second session lasted approximately one hour, and dealt with "blended family" issues and good touch/bad touch concerns.

Respondent renewed his motion for change of custody in August 1992. The court denied immediate relief, but ordered a hearing to address the issues raised in respondent's motion.

Between September and November of 1992, appellant, M.A. and M.J. were evaluated by a clinical psychologist, Dr. Berch Offutt. Based on his testing, Dr. Offutt was unable to find any signs of endangerment or emotional problems in appellant, M.J., or M.A.

In December 1992, Marth, the guardian ad litem, proposed that respondent be given physical custody of M.A. and M.J. Subsequently, hearings on respondent's motion for change of custody (which had been denied in August) were held in December 1992 and January, March and May 1993. In August 1993, the trial court ordered that physical custody of M.A. and M.J. be placed with respondent. The critical finding of the court was that the children's present environment endangered their health and emotional development. The court also ordered that respondent's child support obligation be retroactively reduced from $400 to $200 per month, and that respondent pay ⅓ of the guardian ad litem's fee and appellant pay ⅔ of the fee.

## ISSUES

1. Did sufficient evidence exist to support the district court's finding of endangerment, such that modification of custody was justified?

2. Did the district court properly apply Minn.Stat. § 518.64 in its modification of respondent's child support obligation?

## ANALYSIS

■ 1. An appellate court will not reverse a custody determination unless the trial court abused its discretion by making findings unsupported by the evidence or by improperly applying the law. *Pikula v. Pikula*, 374 N.W.2d 705, 710 (Minn.1985).

■ Minn.Stat. § 518.18 (1992) sets forth the factors to be considered when modifying a custody order. The trial court must first find that the child's or custodian's circumstances have changed since the prior order, such that a modification of custody is necessary to serve the best interests of the child. Minn.Stat. § 518.18(d). Then, the custody is not to be modified unless the present custodian agrees, or the child has been integrated into the petitioner's family with the custodian's consent, or

[t]he child's present environment endangers the child's physical or emotional health or impairs the child's emotional development and the harm likely to be caused by a change of environment is out-

weighed by the advantage of a change to the child.

Minn.Stat. § 518.18(d)(iii).[1]

In its August 1993 order, the trial court concludes

> that a significant change in the circumstances of the child and the custodian have occurred because of [appellant's] belief in the sexual abuse of the child. This has resulted in significant suspicion, exertion of control, denial of visitation and mistrust of the [respondent] by the [appellant].

The court found that "the [appellant] has intentionally and systematically interfered in the visitation between the [respondent] and the minor children," and "that the deprivation of visitation will result in emotional and physical damage to the minor children," and "will destroy the father-child relationships."

The court also found that

> the continuous reminding of the child [M.J.] of the alleged but unproven sexual abuse continues to be harmful to her development. The continual reminder of the past has not abated and in the opinion of the guardian ad litem is detrimental to the child.

█ Finally, the court found that "the guardian ad litem has observed cooperation and a desire to normalize the situation on behalf of the [respondent] but that the [appellant] has continued to be obstructive, unyielding, uncompromising, [and] uncooperative."[2]

Appellant contends these findings are without support in the record and are not sufficient to meet the threshold requirement of actual endangerment contemplated by the legislature and this court. We agree.

**(a) Interference with visitation**

█ Our statutes declare that unwarranted denial of or interference with visitation "may be sufficient cause for reversal of custody." Minn.Stat. § 518.175, subd. 4 (1992). But unwarranted denial of or interference with visitation, in and of itself, is not controlling. Rather, it is only one factor that must be considered along with the standards set forth in Minn.Stat. § 518.18(d). *Grein v. Grein,* 364 N.W.2d 383, 386 (Minn.1985).

█ Additionally, the evidence supporting the trial court's finding of visitation interference is not sufficient to warrant a reversal of custody. Visitation problems occurred throughout 1991 and the beginning of 1992, yet these problems supposedly were considered in the prior proceedings when the court found there was insufficient evidence to modify custody or even schedule a hearing to address the issue at that time. While the trial court noted that visitation had been less problematic when the children stayed with respondent during the summer of 1992, undisputed evidence shows that respondent had enjoyed regular visitation since that time. There was no evidence that visitation problems were continuing when the trial court modified custody in August 1993.

[6] There was also insufficient evidence that the visitation problems that did occur in 1991 and early 1992 actually endangered the children's welfare. Normally, given the statutory requirement for proof of endangerment as a condition for a custody modification, the conduct or circumstance of a parent, including visitation interference, does not establish

---

1. It is normally impermissible to modify a child custody order on a motion made within two years after denial of a prior, similar motion on the merits. Exceptions are made only for cases where (1) the trial court finds there is persistent and willful denial of or interference with visitation, or (2) the court has reason to believe that the health or emotional development of the children is presently endangered. Minn.Stat. § 518.18(b), (c). Respondent brought several motions for modification of custody in 1991 and 1992. We do not address this issue because the record is incomplete regarding the continuances in 1992, and we ultimately hold that modification was not warranted here.

2. The trial court ultimately found that any disruption caused by the change of custody would be outweighed by the advantages to the children. Ultimate findings that a change of custody serves the best interest of children, or that the change would do more good than harm, are suspect when the trial court omits findings characterizing benefits for the children in their present placement. We need not address this issue since we conclude the evidence does not support a finding of present endangerment, but we are troubled by the inattention to appellant's strong relationship with the children.

danger to the welfare of children without evidence of actual adverse effects. The trial court found that appellant's visitation interference had damaged and would continue to damage the father-child relationship. But neither appellant's nor respondent's expert witness could conclude that this damage had actually occurred. And the court acknowledged that "no professional person has examined all of the children with their parents in a fashion to be very helpful to the court." When this is considered with the lack of visitation problems since early 1992, the court's August 1993 finding of endangerment due to interference with visitation is unsupported by the evidence.

### (b) Concern for abuse

■ In its August 1993 memorandum, the trial court found that the guardian ad litem could find no basis for appellant's distrust of respondent, adding that appellant's concerns were unrealistic. This conclusion is flawed in the absence of reliable evidence and definitive findings on the extent of the hazard of abuse and the continued needs of the children arising from any past abuse. Moreover, the record does not sustain the finding that anyone is "continuous[ly] reminding" the children of past abuse.

The court made no express findings on whether any abuse occurred. The county investigative service was unable to independently confirm the occurrence of abuse, but the occurrence is confirmed by the evidence provided both by Levitt and Magnuson. M.J. had made statements found convincing by Dr. Levitt, and was still making spontaneous references to Magnuson about the incident almost two years after it allegedly had occurred.

The court acknowledged that M.J.'s masturbation to the point of injury "may be" excessive, but noted that this behavior seemed to subside during the children's summer with respondent. Yet there are no findings or evidence to address why this behavior subsided only to resume a short time later.

The court suggested that appellant would derive significant benefits from counseling even as it found that continued counseling would actually be "injurious" to M.J. and

M.A. And the guardian was the only witness to opine that continued counseling was dangerous. Magnuson suggested that counseling should continue. Dr. Levitt, while stating that the parties should not dwell upon the alleged touching incident, was not suggesting a cessation of counseling but rather an approach to counseling.

Finally, the court concluded the children would be protected because respondent and his spouse had taken proper remedial action, but neither the findings nor the evidence show what constituted remedial action.

### (c) Hostility between the parties

■ The trial court emphasized its conclusion that respondent was generally cooperative while it characterized appellant as unyielding, and found that this would be harmful to the children. The record does not support this conclusion.

The guardian ad litem felt that appellant was the cause of all the visitation problems. But the guardian based his conclusions almost entirely on information he received from respondent. The guardian frequently visited respondent's home, but rarely observed appellant and the children together. The guardian admitted that he had made only two phone calls to appellant's home between February and December of 1992. The guardian observed only one incident when visitation did not occur, and that was when the children had refused to accompany the guardian and respondent's spouse for the car ride to respondent's home.

The trial court found that the parties' "combative relationship" would endanger the children. But the court found this was evidenced by M.A.'s physical illness due to respondent's failure to pick up M.A. for visitation, a circumstance that concerned appellant, who brought it to respondent's attention.

■ We conclude the trial court improperly modified the prior custody arrangement. Modification of custody requires a finding that the present environment of the children endangers their health or emotional development. Minn.Stat. § 518.18(d)(iii). The evi-

dence does not support such a finding in the present case.

■ 2. An appellate court will not reverse a trial court's determination on modification of child support absent an abuse of discretion. *Fifield v. Fifield,* 360 N.W.2d 673, 675 (Minn.App.1985).

■ Minn.Stat. § 518.64 (West Supp. 1993) controls modification of child support orders. When modifying an order, the court is prohibited from considering the financial circumstances of each party's spouse. Minn. Stat. § 518.64, subd. 2(b)(1). And, a modification normally may be retroactive only for the period that a party has pending a motion for modification. *See* Minn.Stat. § 518.64, subd. 2(c); *Buntje v. Buntje,* 511 N.W.2d 479 (Minn.App.1994).

■ In its order of August 1993, the court found that respondent's income had increased since the original $400 per month order, but that respondent's current spouse received no child support from the father of her own two children. Respondent's motion was made in April 1992, and requested modification effective December 1991. In its August 1993 order, the court granted respondent's motion and retroactively reduced his support obligation to $200.

The trial court did not meet the statutory criteria for modifying respondent's child support obligation. The court specifically considered respondent's spouse's financial circumstances, which is prohibited by statute. And the modification apparently was made retroactive to December 1991, four months prior to respondent's motion, again contrary to the statute.

## DECISION

The trial court's modification of custody was improper due to the lack of evidence supporting a finding that the children were endangered by their present environment.

Improper application of Minn.Stat. § 518.64 constituted an abuse of the trial court's discretion on the modification of respondent's child support obligation. Accordingly, we reverse and direct the trial court to effect the transfer of the children back to the custody of appellant at the earliest reasonable time. But we stay implementation of this direction pending completion of all appellate proceedings in this case.[3]

**Reversed.**

3. Our reversal of the trial court demonstrates the hazards inherent in a trial court's decision to deny a stay in cases where the court's order calls for a major change in a child's living arrangements. The trial court did not abuse its discretion in denying appellant's request for a stay pending appeal. *See Petersen v. Petersen,* 296 Minn. 147, 206 N.W.2d 658 (1973). But since

*Petersen* was decided, the legislature has modified various statutes to discourage interruption of a child's stable living circumstances. *See, e.g.,* Minn.Stat. §§ 518.131, 518.18 (1992). These statutory changes lend support for greater caution in a court's decision regarding a stay following major changes in a child's custody or circumstances.